862 A.2d 33

Joseph Kevin LIVESAY

v.

BALTIMORE COUNTY, Maryland, et al.

No. 7, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 19, 2004.

2

Howard J. Schulman, Joseph S. Kaufman (Schulman & Kaufman, LLC, on brief), Baltimore, for appellant.

Thomas H. Bostwick, Asst. Cty. Atty. (Edward J. Gilliss, Cty. Atty., on brief), for appellees.

**4**

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

This case is a lawsuit filed pursuant to the Local Government Tort Claims Act, Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 5–301 *et seq.* of the Courts and Judicial Proceedings Article.[1] The complaint alleges negligence against Baltimore County, Baltimore County Detention Center Warden Dorothy Williams, Classification Supervisor George Jackson, Corrections Officer Ricky Fore, and nurse Kenya Thomas of Prison Health Services, Inc., in connection with appellant Joseph Kevin Livesay's attempted suicide while he was an inmate at the detention center.[2] The Circuit Court for Baltimore County granted summary judgment in favor of Fore and Baltimore County on the grounds of public official immunity and Governmental Immunity, and in favor of Jackson on the grounds that there were no material facts in dispute and he was entitled to judgment as a matter of law.[3] Appellant noted

---

1. Unless indicated otherwise, all future statutory references will be to Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), Courts and Judicial Proceeding Article.

2. In his complaint, appellant alleged first that Fore, Williams, and the County were negligent in allowing Livesay to remain hanging between the time he was discovered by Fore and the arrival of an Emergency Response Team. Second, he alleged that Williams, Jackson, Thomas, and the County were negligent in assigning Livesay to routine housing and in not taking steps to prevent his suicide attempt. Third, he alleged that Williams and the County were negligent in failing to design and implement policies to prevent Livesay from being sexually assaulted while in the Detention Center. Fourth, he alleged that Williams and the County were negligent in hiring and retaining Fore, Jackson, and Thomas.

3. The record does not indicate whether Williams or Thomas have ever been served with process in this action. Neither has participated in this action. The docket indicates that Writs of Summons were issued for all five defendants on July 2, 2002, with no return of service in the file. Livesay requested that the summons be reissued for Williams and Thomas on June 27, 2003, and new Writs of Summons were issued the same day. Correspondence sent to Thomas at the detention center was marked "return to sender."

a timely appeal to the Court of Special Appeals and this Court granted certiorari on its own initiative. We consider the following questions: (1) Whether the Local Government Tort Claims Act (LGTCA) eliminates the immunity defenses asserted by the County employees; (2) whether Md.Code (1973, 2002 Repl.Vol., 2004 Cum.Supp.), § 5–507(b)(1) of the Courts and Judicial Proceedings Article applies to county as well as municipal employees; (3) whether a Corrections Officer is a "public official" entitled to statutory and common law qualified immunity; and (4) whether Officer Fore was acting in a discretionary capacity when he discovered appellant. We shall affirm the judgment of the Circuit Court and hold that Fore and the County were entitled to immunity and that summary judgment was proper as to Jackson.

## I.

Appellant was arrested on June 30, 1999, after a traffic stop, and charged with fleeing and eluding a police officer, driving while revoked and suspended, and related traffic offenses. The District Court set bail at $10,000 and appellant was committed and transported to the Detention Center. He received a health evaluation, conducted by Kenya Thomas, a Prison Health Services, Inc., nurse. On the checklist completed during this evaluation, Thomas indicated that Livesay's general appearance and affect were normal, that he had no history of suicide attempt, no current suicidal ideation, and no history or evidence of self-mutilation.[4] Thomas also indicated that Livesay could be assigned to the general population. The

---

Appellees stated in their October 17, 2003 Memorandum in Support of Motion for Summary Judgment, upon information and belief, that Williams was deceased, that they expected Livesay would dismiss the action with regard to Williams, and that Thomas was separately represented by her employer's counsel. In their brief, however, appellees assert that "Ms. Williams died prior to being served, and Ms. Thomas was never served, and therefore, they were not parties to the lawsuit or this appeal." We will proceed under the assumption that neither Williams nor Thomas were parties before the Circuit Court.

4. In his complaint, Livesay alleged that the Detention Center had on file a "General Information Report" from a previous stay at the Detention Center, describing him as "possibly suicidal." This record was alleged-

next day, a classification counselor at the Detention Center found no medical or mental health issues and specifically, no suicide risk.[5] Livesay was assigned a "mid-level" classification.

At approximately 6:50 P.M. on July 5, 1999, an inmate alerted appellee Corrections Officer Ricky Fore that there was an unconscious man in cell twenty. According to Fore's deposition, he immediately ran up a flight of stairs to discover Livesay sitting slumped on the floor of his cell, a bed sheet tied between his neck and the bunk bed. Fore did not render direct assistance to Livesay, but instead radioed a "Code Two" medical alert to summon the facility's Emergency Response Team ("ERT"). Inmates had gathered outside Livesay's cell, and Fore next cleared the area by ordering them to "lock in" to their own cells. Fore did not believe himself to be in any physical danger, but described himself as "just in shock." The ERT arrived approximately five minutes after Fore issued the Code Two. The ERT personnel rendered emergency medical aid until paramedics arrived; appellant was then transported to Greater Baltimore Medical Center and eventually to Shock Trauma for further treatment. Appellant suffered oxygen deprivation, which caused some brain damage.[6]

Section 11.3(H) of the *Baltimore County Bureau of Corrections Operations Manual* ("Operations Manual") states as follows:

---

ly created in response to a March 3, 1999 telephone call between Livesay's mother Patricia and a Sgt. Brian Matricciani, in which she informed the Sergeant that Livesay was depressed, was undergoing heroin withdrawal, and had attempted to hurt himself in the past. However, Livesay did not submit any evidence of the record or conversation in support of his Opposition to Defendants' Motion for Summary Judgment, nor did he refer to them in his Memorandum of Law.

5. The Intake Classification Form was not signed, but Livesay alleged in his complaint that appellee George Jackson was the Detention Center's Classification Supervisor. Jackson later gave deposition testimony that he had no direct involvement with Livesay's classification and did not recall any indirect involvement.

6. Livesay remains incompetent as a result of his injuries and files suit through his guardian and next friend Patricia Livesay.

*"Intervention During Suicide Attempt*

1. An officer responding to a suicide attempt will immediately intervene based on the circumstances of the suicide attempt. The officer will respond based on their training. Generally, the officer's response may include:

 a. Assessment of the Officer's and others' safety;

 b. Securing the area;

 c. Notifying the Central Control / Front Desk and summoning additional help if needed;

 d. Talk in a non-threatening way;

 e. Listening to the inmate;

 f. Extricating the victim, if hanging, while protecting the head and neck as much as possible;

 g. Administering C.P.R. and/or other First Aid techniques;

 h. Utilization of protective safety equipment (i.e. rubber gloves, MADA Mask, etc.)"

According to an internal affairs investigation report, appellee Fore had attended a Bureau of Corrections presentation entitled *Suicide Discovery and Response* on September 23, 1998, and received a passing score on the examination. Sgt. John Ripley, the Bureau's Training Coordinator, told the internal affairs investigator that Corrections Officers are taught to respond in the following manner to inmate suicide attempts:

"● Immediately intervene.

● Extricate the victim as soon as possible (if hanging).

● Always assume the victim is alive and administer First Aid or CPR if needed.

● Never leave the victim alone."

Sgt. Ripley stated to the investigation that he does not deviate from his lesson plan (the "Lesson Plan"), which reads as follows:

"Always ASSUME the victim is alive

 1. Administer First Aid and/or C.P.R.

1. REMEMBER ONLY a certified M.D. or Coroner, M.E. can pronounce an individual dead!

2. Protect the head and neck when cutting victim down.

3. PROCEDURE (Hanging Victim)

A. Start E.M.S. (emergency medical services) notification process

B. One officer holds victim and stabilizes the head.

C. Another officer cuts, loosens or removes the noose. ASSUME that the spinal cord is injured.

CAUTION:

Some victims are lost because too much time is spent cutting them down!

\* \* \*

D. Administer Rescue Breathing or C.P.R. if needed.

E. DO NOT GIVE THESE ITEMS TO A SUICIDE VICTIM

E1. Water

E2. Food

E3. Medication

F. Never leave victim alone

G. If there is DISCOLORATION or SWELLING apply an ice bag to that area."

Eugene M. Nuth, a former Warden of several Maryland county and state facilities, executed an affidavit (the "Nuth Affidavit") stating as follows:

"Based on Baltimore County Bureau of Corrections suicide prevention policies and training, it is my opinion that Ricky Fore should have attempted to extricate Joseph Kevin Livesay, freed his airway, and applied CPR and other first-aid techniques in which he was trained.

Once officer Fore satisfied himself as to his own safety, which he did, it is my opinion that the palliative steps described in the foregoing paragraph were ministerial applications of existing policy. When he withheld these steps,

Officer Fore was not making a discretionary decision, but was failing to carry out a ministerial function of his job."

As we have indicated, the Circuit Court granted summary judgment in favor of Fore, Jackson, and the County. The court held that Fore enjoyed statutory immunity under § 5–507(b)(1) and that Fore was a public official, engaged in discretionary actions within the scope of his official duties, and had acted without malice. The court further found that, because Livesay had not offered any evidence of Jackson's negligence, there were no disputed material facts with respect to the negligence claim against Jackson, and that Jackson was therefore entitled to judgment as a matter of law. It held that, under the LGTCA, the County could be held liable only to the extent that its employees were liable. Because Livesay was not entitled to relief against Fore and Jackson, the court held that the County was entitled to summary judgment.

Before this Court, Livesay contends that the LGTCA eliminates any immunity that appellees might assert. He also contends that county officials, as opposed to municipal officials, are not entitled to statutory public official immunity. He further contends that Fore was not a public official, and that, even if Fore were a public official, he was not acting in a discretionary capacity.

## II.

As indicated previously, this matter was resolved in the Circuit Court on summary judgment. Whether summary judgment was granted properly is a question of law. The standard of review is *de novo,* and whether the trial court was legally correct. *See Walk v. Hartford Casualty,* 382 Md. 1, 14, 852 A.2d 98, 105 (2004).

Maryland Rule 2–501(e) states that a trial court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In reviewing a grant of summary judgment under

Rule 2–501(e), we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Jurgensen v. New Phoenix,* 380 Md. 106, 114, 843 A.2d 865, 869 (2004). We review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant. *Id.* In addition, it is well established in Maryland that an appellate court ordinarily will consider only the grounds relied upon by the trial court in granting summary judgment. *See, e.g., Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 729 (2001); *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001).

■ To survive a motion for summary judgment, there must exist not just a dispute as to *any* facts, but rather as to facts which are material, *i.e.* necessary to the determination of the case. *Remsburg v. Montgomery,* 376 Md. 568, 580, 831 A.2d 18, 25 (2003); *Lippert v. Jung,* 366 Md. 221, 227, 783 A.2d 206, 209 (2001); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993). Because the instant case involves claims of governmental and public official immunity, disputes as to facts surrounding the underlying causes of action will not be material if summary judgment was proper on the basis of immunity alone. Immunity is a threshold issue that, once established, defeats a claim without inquiry into the underlying merits of the claim.

### III.

We begin our analysis with the negligence claim asserted against Corrections Officer Ricky Fore.

### A.

■ We consider first Livesay's argument that § 5–303(b) of the LGTCA eliminates immunity defenses for local government employees. Section 5–303(b) provides as follows:

"(1) Except as provided in subsection (c) of this section [governing punitive damages], a local government shall be

liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection."

Section 5–303(b) requires local governments to indemnify employees for torts committed within the scope of employment, and prevents the governmental entity from evading this obligation by asserting governmental or sovereign immunity. It does not address the defenses which employees may assert in a tort action. Rather, employees' defenses and immunities are preserved explicitly in § 5–303(d), which provides as follows:

"Notwithstanding the provisions of subsection (b) of this section, this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government."

While the County as indemnor is the real party in interest, the claim is against Fore and is subject to any valid immunity he asserts.

## B.

Fore has asserted both common law and statutory public official immunity. The Circuit Court found that Fore enjoys statutory public official immunity under § 5–507(b)(1). That statute provides as follows:

"An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."

Livesay contends that Baltimore County is not a "municipal corporation" and that Fore thus does not fall within the ambit of the statute. We hold that Fore is cloaked with statutory immunity so long as he is acting in a discretionary capacity,

without malice, and within the scope of his employment or authority.

We have held that the purpose of § 5–507(b)(1) "was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace v. Anderson,* 366 Md. 690, 704, 785 A.2d 726, 734 (2001) (quoting *Ashton v. Brown,* 339 Md. 70, 116 n. 23, 660 A.2d 447, 470 n. 23 (1995)). As discussed *infra,* officials of Maryland counties enjoy common law public official immunity. Section 5–507(b)(1) codified the common law, and while it did not extend the scope of the common law, it did not limit it either. Under the common law, county public officials enjoyed immunity; accordingly, despite the seemingly narrower drafting, § 5–507(b)(1) applies to county as well as municipal officials. As appellees point out, a contrary holding would produce the absurd result that when city and county police respond to the same emergency, the former enjoy immunity but the latter do not. We do not believe the Legislature intended this result.

█ Because we hold that § 5–507(b)(1) merely codified Maryland common law public official immunity, and because the case law on common law public official immunity is more developed, we shall analyze Fore's situation in that context. A governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice. *See Lovelace v. Anderson,* 366 Md. 690, 714, 785 A.2d 726, 739 (2001) (citing *James v. Prince George's County,* 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980)); *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 137, 753 A.2d 41, 61 (2000).

Fore must have been acting as a public official if he is to be immune from liability for his conduct. At the time of the conduct at issue, he was acting as a corrections officer, *i.e.* as a prison guard. We hold that, in accord with *Carder v. Steiner,*

225 Md. 271, 170 A.2d 220 (1961), as a prison guard, Fore was a public official.

Carder, a prisoner, sued a guard and the Warden of the Maryland House of Corrections alleging, *inter alia*, that the prison guard maliciously, wilfully, and negligently closed Carder's cell door, knowing that the door would strike him. Carder contended that the guard was not a public official and hence was not entitled to public official immunity on the grounds that the guard's duties were ministerial only and that he was liable for negligence in their performance, without a showing of malice. The guard argued that he was a public officer exercising discretion, and therefore was immune unless he had acted with malice. We held that a prison guard is a public officer, entitled to immunity. We stated as follows:

> "We agree that the guard is a public officer within the meaning of the rule of the *Ferling*[7] and *Cocking*[8] cases. Immunity from liability rests not on the dignity of the office but rather upon the nature of the function exercised. A policeman has been held to be a public officer. A prison guard, like a policeman, acts as an arm of the State, in keeping incarcerated those committed to imprisonment and in maintaining order in the prison, and is not to be held liable civilly for damages resulting from mere negligence in the performance of his duties."

*Id.* at 275–6, 170 A.2d at 222. (Citations omitted).

Appellant maintains that *Carder* was overruled by *James.* Appellant's argument is based upon a footnote in *James,* stating that "[t]o the extent that *Carder v. Steiner,* 225 Md. 271, 170 A.2d 220 (1961) and similar cases indicate that the existence of the first factor alone is sufficient to create public-official immunity, they are overruled." *James,* 288 Md. at 323 n. 9, 418 A.2d at 1178 n. 9.

---

**7.** *State, Use, Clark v. Ferling,* 220 Md. 109, 151 A.2d 137 (1959).

**8.** *Cocking v. Wade,* 87 Md. 529, 40 A. 104 (1898).

Appellant reads too much into footnote nine. In *James*, this Court addressed common law public official immunity, observing as follows:

"Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties. Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability."

*Id.* at 323–324, 418 A.2d at 1178 (internal citations omitted). The footnote made clear that *Carder* and similar cases were overruled only to the extent that those cases held that public official status alone was sufficient to support immunity. *James* made clear that in addition to public official status, proof that the public official was performing discretionary acts is also a necessary requirement. It did not purport to overrule *Carder*'s specific holding that a prison guard was a public official in the context of public official immunity.

The rule of *stare decisis* dictates the outcome of our decision today. *Stare decisis,* which means to stand by the thing decided, "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). The United States Supreme Court has noted that "by the important doctrine of *stare decisis* ... we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). That Court also

explained that *stare decisis* "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Id.* at 265–66, 106 S.Ct. at 624. While a court has the judicial power to overrule prior cases, courts generally act in a constrained manner to create predictability, "stability and integrity in the law." *McMellon v. United States*, 387 F.3d 329, 355 (4th Cir.2004).

While we have never construed the doctrine of *stare decisis* to preclude us from changing or modifying a common law rule when conditions have changed or that rule has become so unsound that it is no longer suitable to the people of this State, departure from the rule should be the extraordinary case, especially so when the change will have a harmful effect upon society. *See Bozman v. Bozman*, 376 Md. 461, 493, 830 A.2d 450, 469 (2003); *Boblitz v. Boblitz*, 296 Md. 242, 274, 462 A.2d 506, 521–22 (1983). Fore and Jackson, when they accepted employment, had every reason to believe, based on *Carder*, that they would be protected from suit by public official immunity. The circumstances of prisoners and prison guards have not changed so much in this regard in forty-three years as to warrant reversal of our earlier *per se* classification. Furthermore, the State and counties have been able to attract and retain corrections officers these many years with the expectation that the officers' discretionary, non-malicious actions would not subject them to liability. We should not, and do not, overrule *Carder*.

## C.

Having established that Fore is a "public official," we next consider whether his actions surrounding Livesay's suicide attempt were discretionary, rather than ministerial. Livesay argues that Fore was under a mandate to protect him because Fore was in charge of Livesay's section of the Detention Center. He maintains that while Fore may have had discretion as to how he protected Livesay, he did not have discretion as to whether to come to his aid once he discovered Livesay on

his cell floor. He contends that the Bureau of Corrections regulations mandated that Fore should have acted immediately and not have left Livesay.

We have stated that " 'ministerial refers to duties in respect to which nothing is left to discretion as distinguished from those where the official has the freedom and authority to make decisions and choices,' " *James*, 288 Md. at 326, 418 A.2d at 1179 (quoting *Ferling*, 220 Md. at 113, 151 A.2d at 139 (1959)). We expounded upon the term "discretion" as follows:

" 'The term "discretion" denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, "discretion" is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience and uncontrolled by the judgment or conscience of others.' "

*James*, 288 Md. at 326, 418 A.2d at 1179 (quoting *Schneider v. Hawkins*, 179 Md. 21, 25, 16 A.2d 861, 864 (1940)).

The Circuit Court considered two potential sources of information about Fore's instructions in the event of an inmate suicide attempt: the Operations Manual and the Lesson Plan. Livesay contends that the Operations Manual sets out a prescribed, non-discretionary protocol for responding to an inmate suicide attempt. We do not agree.

The plain language of the Operations Manual makes clear that "the officer's response *may* include" a number of different actions (emphasis added); those actions include direct lifesaving measures, assessing the safety of the officer and others, securing the area, notifying the facility's control units, and summoning additional help. "May" is generally interpreted as permissive, in contrast with "shall," which is interpreted as mandatory. *See Board of Physician Quality v. Mullan*, 381 Md. 157, 166, 848 A.2d 642, 648 (2004); *State v. Green*, 367 Md. 61, 82, 785 A.2d 1275, 1287 (2001); *Brodsky v. Brodsky*, 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990). The manual says "may" and thus conveys discretion. The plain language of the Operations Manual defeats Livesay's argument that the Oper-

ations Manual creates a mandatory, non-discretionary duty. The Lesson Plan, while it contains a protocol for providing direct life saving aid to an individual attempting suicide, addresses only the manner in which such measures should be undertaken. It does not mandate direct intervention to the exclusion of other responses. It is clear that, reading the Operations Manual and Lesson Plan together, officers retain the discretion to select the appropriate response, based on the circumstances.

In *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986), we considered a similar issue. There, the Court considered whether a county police officer may be held liable to a person injured by a drunk driver where the officer detected the driver's condition before the accident but failed to detain him. The appellant, Ashburn, argued that the police officer was not immune from suit under the doctrine of public official immunity because he negligently failed to perform the mandatory (as opposed to discretionary) act of detaining a drunk driver. Ashburn cited a statutory procedure [9] for processing suspected drunk drivers and argued that it had created a ministerial duty for the officer to detain an apparently drunk driver discovered behind the wheel of an idling truck. *Id.* at 624, 510 A.2d at 1081–82. We noted, however, that the entire procedure was proceeded by the phrase "*if* a police officer stops or detains any individual...." *Id.* at 625, 510 A.2d at 1082. We held that, even assuming the procedure was the mandatory method for processing a suspected drunk driver once detained, the threshold decision to detain was itself discretionary. *Id.*

Similarly, in this case, the plan and manual did not create a mandatory duty to act in a particular manner and did not transform the inherently discretionary decision to commence direct lifesaving measures into a ministerial one. Finally, because the question of whether a public official's act was discretionary or ministerial is one of law, the Circuit Court

---

9. *See* Md.Code (1977, 1984 Repl.Vol.), § 16–205.1(b) of the Transportation Article.

was not required to give any weight to Eugene M. Nuth's affidavit statement that Fore "was not making a discretionary decision, but was failing to carry out a ministerial function of his job."

The Circuit Court did not err in finding that Fore was acting in a discretionary capacity within the meaning of the public official immunity doctrine.

## IV.

 Livesay, for the first time, contends that Fore established a "special relationship" with him, and that under our holdings in *Williams* and *Ashburn*, this defeats Fore's claim of immunity. Livesay also contends for the first time that Fore acted with "deliberate indifference" when he failed to render direct aid.

Because these issues were not raised below, we shall not consider them. We have held consistently that this Court will not ordinarily decide issues not raised in and decided by a trial court. *See Taylor v. State*, 381 Md. 602, 612, 851 A.2d 551, 557 (2004) (citing Md. Rule 8–131(a) in holding that a claim of double jeopardy was not preserved because it was not raised at the trial level); *Conyers v. State*, 354 Md. 132, 148, 729 A.2d 910, 918 (1999) (citing Md. Rule 8–131(a) in holding that several issues in review of a death sentence were not preserved because they were not raised at the trial level); *Walker v. State*, 338 Md. 253, 262, 658 A.2d 239, 243 (1995) (citing Md. Rule 8–131(a) in holding that issues relating to denial of due process because of prosecutorial misconduct and denial of Sixth Amendment right to counsel during pre-trial proceedings were not properly raised below); *White v. State*, 324 Md. 626, 640, 598 A.2d 187, 194 (1991) (citing Md. Rule 8–131(a) in holding that claim of deprivation of constitutional right to present witnesses in defense was not properly before the Court because the argument was not made to the trial court); *In re John H.*, 293 Md. 295, 303, 443 A.2d 594, 598 (1982) (citing Rule 885, a predecessor of Md. Rule 8–131(a), in not reaching the issue of whether statute was constitutional be-

cause the issue of constitutionality was not argued to the trial court). In *Medley v. State*, 52 Md.App. 225, 448 A.2d 363 (1982), the Court of Special Appeals examined the purpose of Rule 885, a predecessor to Md. Rule 8–131(a), and noted that "[i]t is a matter of basic fairness to the trial court and to opposing counsel, as well as being fundamental to the proper administration of justice; and one need only look at the extensive annotations to Maryland Rules 885 and 1085 to see that it is rigorously enforced." *Id.* at 231, 448 A.2d at 366.

## V.

We turn now to the negligence claim against appellee George Jackson, the classification supervisor. The Circuit Court granted summary judgment in favor of Jackson on the merits of that claim, rather than on the basis of public official immunity; therefore, we will review the grant on that basis alone.

Livesay's complaint alleges that Jackson owed Livesay a duty of reasonable care to keep him safe and free from harm while he was in custody at the Detention Center. According to the complaint, Jackson "breached this duty to [Livesay] when, despite documentary, medical, and behavioral evidence of Plaintiff's past and present depression, agitation, drug withdrawal and potential for suicide, [Jackson] placed [Livesay] in routine diagnostic housing ... and took no steps to prevent [Livesay]'s suicide attempt...."

Livesay submitted no evidence whatsoever of Jackson's role in Livesay's stay at the Detention Center. Livesay's Memorandum of Law in Opposition to Defendants' Motion to Dismiss does not address the claim against Jackson. Although Livesay alleges in his complaint that the Detention Center maintained a record of a prior conversation between Patricia Livesay and Detention Center personnel, no evidence of this record or of the conversation were before the court.

There was no evidence before the Circuit Court establishing any act or omission on the part of Jackson, let alone one which would constitute a breach of his duty to Livesay. The court

correctly concluded that no facts material to this claim were in dispute, and that Jackson was entitled to judgment as a matter of law.

## VI.

▮▮ Finally, we address the grant of summary judgment to the County. To the extent that the County is joined as indemnor of Fore and Jackson, its liability is dependant on that of its employees and it "may only be held liable to the extent that a judgment could have been rendered against . . . an employee under this subtitle." § 5–303(e). Because, as discussed *supra*, summary judgment was proper as to Fore and Jackson, it is likewise proper for the County as indemnor.

Livesay's complaint also alleges vicarious liability on the part of the County for the actions of Fore, Jackson, Thomas, and Williams. Section 5–303(d) makes clear that the Local Government Tort Claims Act does not waive the County's common law governmental immunity in any extent more broad than its duty to indemnify employees. We have previously made clear that "the LGTCA does not waive governmental immunity or otherwise authorize any actions directly against local governments. . . ." *Williams v. Maynard,* 359 Md. 379, 394, 754 A.2d 379, 388 (2000). *See also Martino v. Bell,* 40 F.Supp.2d 719, 722 (D.Md.1999) (LGTCA did not permit plaintiffs to name county directly in state law claims for wrongful arrest, false imprisonment, and malicious prosecution); *Dawson v. Prince George's County,* 896 F.Supp. 537, 539 (D.Md. 1995) (although county was financially responsible under LGTCA for judgment against employee, Act does not create liability on part of county).

As there were no material facts which could have established the County's liability, and governmental immunity entitled the County to judgment as a matter of law, the Circuit Court did not err in granting summary judgment on all counts.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*