REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2592

SEPTEMBER TERM, 2014

MELODY SHUTTER

v.

CSX TRANSPORTATION, INC.

Eyler, Deborah S.,
Berger,
Moylan, Charles E., Jr.
   (Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.

Filed: January 29, 2016

Kevin F. Arthur, J., did not participate in the
Court's decision to report this opinion pursuant
to Md. Rule 8-605.1.

In the Circuit Court for Baltimore City, Melody Shutter, the appellant, filed suit against her employer, CSX Transportation, Inc. ("CSX"), the appellee, under the Federal Employers' Liability Act ("the FELA"), 45 U.S.C. §§ 51, *et seq*. Shutter alleged that she had suffered a repetitive trauma injury to her lower back as a result of CSX's negligence. CSX moved to preclude Shutter's expert witnesses, because they were designated late, and to exclude certain evidence, and for summary judgment. The circuit court heard argument and granted CSX's motions to exclude Shutter's liability expert and to preclude parol evidence about the meaning of a release. It then granted summary judgment in favor of CSX on two bases: that Shutter's claim was barred by the release and that, because Shutter's liability expert had been excluded, she could not prove a breach of the standard of care. CSX also had moved for summary judgment on the ground that Shutter's claim was time-barred. The court declined to grant summary judgment on that basis.

Shutter appeals, presenting six questions for review, which we have combined, rephrased, and reordered:

> I. Did the circuit court err by granting summary judgment in favor of CSX on the ground that her claim was barred by a release, and by precluding parol evidence of Shutter's understanding of the release?

> II. Did the circuit court err by excluding Shutter's liability expert and granting summary judgment in favor of CSX on the ground that she could not establish a breach of the standard of care?

> III. Did the circuit court err by sustaining certain objections made by counsel for CSX during the *de bene esse* depositions of two of Shutter's medical experts?

IV. Did the circuit court err by ruling that evidence of an offer made by CSX to pay Shutter's college tuition would be admissible at trial?

In a conditional cross-appeal, CSX asks whether the circuit court erred by denying its motion for summary judgment on the basis of limitations.

For the following reasons, we conclude that the court correctly ruled that Shutter's claim was barred by the release, and also correctly ruled that Shutter could not make out a *prima facie* case of negligence. Because we shall affirm the grant of summary judgment on these bases, we shall not reach the remaining issues presented by Shutter or CSX's cross-appeal.

## FACTS AND PROCEEDINGS

Shutter, who is 50 years old, has been employed by CSX and one of its predecessors, Consolidated Rail Corporation, since 1993. In the 1990s and early 2000s, she worked as a "carman," inspecting and repairing freight rail cars. In the course of this work, she began experiencing pain in her low back, ankles, and hand. In 2002, she went out on medical leave.

In early 2003,[1] Shutter underwent surgery to fuse her vertebrae at the L4-L5 and L5-S1 levels of her lumbar spine. Thereafter, on July 8, 2003, she met with a CSX Claims Representative and executed a "Release Agreement" ("the Release").[2]

---

[1] The record does not reflect the date of Shutter's 2003 surgery.

[2] Shutter executed a second release agreement in 2004 ("the 2004 Release") relative to injuries to her hand.

2

The Release states that Shutter made a claim against CSX alleging that she had been exposed to "excessive and harmful repetitive motion, strain, vibration of any type or intensity and/or cumulative trauma due to the equipment and methods with which []she performed []her work," and that as a result, she had sustained injuries to her back and both ankles. The injuries included "intrasubstance changes and arthritic changes and disc herniation and/or bulge located at L4-5 and L5-S1, (hereinafter collectively referred to as 'Repetitive Strain Injury') *including any disorder of any type or origin or any condition, illness or injury resulting therefrom or relating thereto*." (Italicized emphasis added.) The Release further provides that in consideration for the payment by CSX of $68,000, Shutter

> does hereby release and forever discharge [CSX] from all legal liability for personal injuries as set forth herein, known or unknown, foreseen or unforeseen, including claims, causes of action, . . . and demands for monetary compensation of any nature, which [Shutter] has or claims to be entitled *by reason of [her] alleged Repetitive Strain Injury, its progression and/or consequences,* any future damages, general or special, that [Shutter] may incur in an attempt to alleviate or cure [her] alleged Repetitive Strain Injury, including surgery or surgeries, *as well as correction of any conditions relating to [her] Repetitive Strain Injury, and any increased risk of contracting any physical disorder related thereto.*

(Emphasis added.)

In the Release, Shutter acknowledges that she understands that her injury "may be permanent and/or may naturally progress and/or may become permanently disabling in the future"; that "recovery therefrom is uncertain"; and that "future medical treatment, including surgery, may be necessary in an attempt to alleviate or treat said Repetitive Strain Injury." She agrees that she has not been induced to enter into the Release by any

3

representations about the "nature and extent of [her] present or future condition," and is relying "wholly upon [her] own judgment, belief, and knowledge of the nature and extent of [her] injuries, including the permanency and the possibility of progression of such injuries." She acknowledges that the "possible future effects of [her] Repetitive Strain Injury are specifically bargained for herein, included, and released in exchange for the payment of [$68,000]." The Release specifies that it does not release "any claim [Shutter] may have in the future for a solely new and distinct railroad employment related injury."

In October of 2004, Shutter returned to work as a carman.[3] In 2007, Riva Gill, M.D., an internist, became her primary care physician. Over the next four years, Dr. Gill treated Shutter for recurrent low back pain and muscle spasms, prescribing pain medication and muscle relaxers.

Meanwhile, in 2008, Shutter applied for and received a transfer to a "line of road" position at CSX. As a "line of road" worker, Shutter drove to locations around the I-95 corridor, between Jessup to the north, Richmond, Virginia to the south, and Rockville to the west, repairing trains on the main lines. Initially, she traveled with a partner and they made repairs as a team. Around 2009, her partner was transferred as a result of misconduct and was not replaced. From that point forward, Shutter performed her "line of road" work alone.

---

[3] The doctor who performed the 2003 spinal fusion surgery initially advised Shutter not to return to her previous position at CSX. Ultimately, however, Shutter was cleared by her surgeon and CSX's medical staff to return to her job.

4

In January of 2010, Shutter went to Dr. Gill with complaints of "severe" low back pain. According to Dr. Gill, at that time Shutter's pain was getting "progressively worse," but still was muscular in presentation.

On September 23, 2011, Dr. Gill treated Shutter for new symptoms, including radiating leg pain and numbness in her lower extremities. After performing an arterial Doppler study to rule out a vascular cause for the symptoms, Dr. Gill diagnosed Shutter with lumbar radiculopathy, possibly caused by a herniated disc in her spinal cord.[4] Dr. Gill sent Shutter for an MRI and advised her to follow up with an orthopaedic surgeon.

On October 13, 2011, Shutter met with Leonid Selya, M.D., a spine surgeon. He reviewed her MRI, which showed a herniated disc at the L3-L4 level of her lumbar spine, directly above the level of her fusion, and significant spinal stenosis, or narrowing of the space in the spinal column, at that level as well. On November 22, 2011, Dr. Selya operated on Shutter to remove the hardware from her 2003 fusion and to fuse her spine at the L3-L4, L4-L5, and L5-S1 levels.

On July 18, 2013, Shutter filed the instant action in the Circuit Court for Baltimore City, asserting a claim under the FELA.[5] The FELA creates a "statutory cause of action for railroad employees who suffer workplace injuries as the result of the negligence of the

---

[4] Radiculopathy is "disease of the nerve roots, such as from . . . impingement by a . . . bony spur." *Dorland's Illustrated Medical Dictionary*, at 1571 (32nd ed. 2012).

[5] Although actions under the FELA are governed by federal law, they may be brought in state court or federal court. *See Blackwell v. CSX Transp., Inc.*, 220 Md. App. 113, 117 (2014).

railroad." *Blackwell v. CSX Transp., Inc.*, 220 Md. App. 113, 117 (2014), *cert. denied*, 442 Md. 194 (2015). Shutter alleged that CSX had "negligently assign[ed] her to physically demanding work performed often times on a repetitive basis, with irregular motions and unnatural postures of the body and without adequate help," and that, as a direct and proximate result, she suffered low back injuries, spine injuries, injuries to her lower and upper extremities, aggravation of a preexisting lumbar condition, and other serious and severe injuries.[6]

On September 2, 2014, CSX moved for summary judgment. It argued, *inter alia*, that Shutter's claims were barred by the three-year statute of limitations under the FELA, and by the Release.[7] On October 10, 2014, the motion was denied without prejudice on those bases.[8]

Shutter was deposed on October 7, 2014. As relevant here, she testified that after her 2003 spinal fusion surgery, she was approached by Carl Kaiser, a claims representative for CSX, and executed the Release. She explained that it was her understanding that she was releasing any claims arising from the injury to "L4 to S1," including "any progression" of that injury. She stated that before she signed the Release

---

[6] Shutter also asserted that CSX was negligent in that it violated the Railroad Safety Appliance Act, 49 U.S.C., §§ 20301 et seq., and the Boiler Inspection Act, now known as the Locomotive Inspection Act, 45 U.S.C. §§ 20701–20703.

[7] It also argued that the claim was barred by the 2004 Release.

[8] The court granted summary judgment in favor of CSX on Shutter's Safety Appliance Act and Boiler Inspection Act claims.

she asked Kaiser "if I get, like, an injury, like, to my neck or, you know, to my spine, is there going to be a problem?" According to Shutter, he replied that the Release only "cover[ed] the . . . levels that you have had your surgery."

Shutter designated Drs. Gill and Selya as expert medical witnesses on the issues of causation and damages. Dr. Gill was deposed on October 29, 2014. She testified that between 2007 and 2009, Shutter complained of low back pain and muscle spasms of the lower back. Dr. Gill opined that the pain and spasms were muscular in nature and she did not view the pain as being connected to Shutter's 2003 surgery. Dr. Gill prescribed Vicodin for the pain and a series of muscle relaxers to treat the spasms.

In Dr. Gill's opinion, Shutter's neurological symptoms in 2011 were a "different injury" from the injury that led to the 2003 spine surgery. She explained that because Shutter "had a fusion before, . . . if [a new disc herniation] was to happen, it [could] not be at [the level fused in 2003]." She clarified that she meant that the "radiculopathy ha[d] to be at a different level than from before . . . [because] [t]he [old] level is fused." Dr. Gill opined that Shutter developed the 2011 disc herniation because of "excessive and repetitive lifting" during her job. In Dr. Gill's opinion, Shutter had not suffered a traumatic injury; rather, "[o]ver time [she] . . . gradually developed a problem in her back."

Dr. Gill was asked whether "the fusion of one level [of the spine] puts any added strain on adjacent levels [of the spine] to the one that is fused?" She replied, "[n]ot without any trauma." She did not offer any other opinions about the relationship between Shutter's disc herniation at the L3-L4 level and her prior fusion surgery.

7

Dr. Selya was deposed on November 19, 2014. He explained that he met with Shutter for the first time in October of 2011 and operated on her on November 22, 2011. He stated that her medical history made clear that she "never [had] recovered her symptoms completely after the [2003] surgery" and had been "in pain for at least seven years."

Dr. Selya opined that Shutter's 2011 symptoms – numbness and radiating pain – were caused by "adjacent disc disease." He explained that adjacent disc disease means changes to the "dis[c] next to the previously fused levels" resulting from "increased pressure on the adjacent dis[c]s" and the lack of mobility in the fused part of the spine. In Shutter's case, the adjacent disc disease presented as spinal stenosis, which is a narrowing of the space in the spinal column, caused by a ruptured disc at the L3-L4 level of her spine.

According to Dr. Selya, "[r]adiologically a majority of people [who have spine fusion surgery] will develop signs of adjacent dis[c] disease," but "very few of them will have clinical presentations" and even fewer will have neurologically involved symptoms. He opined that it was unusual for adjacent disc disease to lead to the "degree of spinal stenosis" experienced by Shutter. Her adjacent disc disease and resulting spinal stenosis were, however, a "progession of having [her] spine . . . fused." In Dr. Selya's opinion, Shutter developed "surgically aggravated trauma to the adjacent dis[c]," meaning that the repetitive lifting and bending at work "caused such a rapid deterioration" of her adjacent disc. Thus, while Shutter's adjacent disc disease was "by definition . . . related to the [2003] surgery," its progression into "symptomatic dis[c] herniation and spinal stenosis"

8

was "precipitated by the excessive trauma" of her work. Dr. Selya agreed that, more likely than not, Shutter would not have developed adjacent disc disease had she not had the surgery in 2003.

On December 1, 2014, CSX filed a second motion for summary judgment based on limitations and on the Release. With respect to the Release, it argued that Shutter had released all claims relative to her 2003 spinal fusion surgery and the progression of her lumbar spine injury, including the possible need for future surgery. It maintained that, given Dr. Selya's opinion that Shutter's 2011 symptoms were caused by a rapid progression of adjacent disc disease, and that adjacent disc disease is, by definition, a disease of a disc adjacent to a fused vertebrae, any claim based on the 2011 disc herniation was barred by the Release.

Shutter responded that there was a genuine dispute of material fact as to whether the disc herniation at the L3-L4 level of her lumbar spine was a new injury. She pointed to Dr. Gill's deposition testimony that she viewed the radiculopathy diagnosis in 2011 as a "different injury," and Dr. Selya's deposition testimony that Shutter would not have developed symptomatic adjacent disc disease but for the repetitive trauma of her job.

Trial was scheduled to commence on January 6, 2015. On that day and the next, the court heard argument on numerous pending motions. In one motion, CSX sought to preclude Shutter from calling Maury Nussbaum, Ph.D., an expert in ergonomics, on the ground that he was not timely designated.

The court granted CSX's motion to exclude parol evidence about the meaning of the Release[9] and granted summary judgment in favor of CSX on the ground that Shutter's claim was barred by the Release. The court opined that the Release was "clear" and "unambiguous on its face" and "encompass[ed] any alleged injury" in this case. The court granted CSX's motion to preclude Dr. Nussbaum from testifying, and also granted summary judgment on the ground that without an expert witness on the applicable standard of care for a "line of road" position, Shutter could not prove negligence. As noted, the court denied summary judgment on limitations.

This timely appeal and cross-appeal followed.

## DISCUSSION

We review the grant of a motion for summary judgment *de novo*. *Baltimore County v. Kelly*, 391 Md. 64, 73 (2006). Thus,

> we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. [*Livesay v. Baltimore*, 384 Md. 1, 9-10 (2004)]. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Id*. at 10, 862 A.2d at 38.

*Myers v. Kayhoe*, 391 Md. 188, 203 (2006).

## I.

### Release

---

[9] CSX had moved to preclude Shutter from testifying about her conversation with Kaiser prior to the execution of the Release.

Shutter contends the circuit court erred in construing the Release to bar her claim. She maintains that the scope of the Release was limited to an aggravation or progression of the injury at the L4-L5 or L5-S1 levels of her spine, not to a new injury at a different level of her spine. She asserts that, to the extent the Release may be construed to encompass the 2011 disc herniation and surgery, it is void under Section 5 of the FELA because its scope is too broad. Shutter also argues that the court erred in precluding her from testifying about her conversation with Kaiser about the meaning of the Release.

CSX responds that the Release is clear and unambiguous and plainly encompasses an injury to the immediately adjacent disc in Shutter's spine that would not have occurred but for the 2003 spinal fusion surgery. Shutter specifically bargained for and released CSX from liability premised on the progression of her existing injury, and adjacent disc disease is such a progression. Moreover, because adjacent disc disease is a known risk of spinal fusion surgery, the Release is valid under Section 5 of the FELA and bars Shutter's claim. Also, because the Release is clear and unambiguous, and because it states that Shutter is entering into it based on her own judgment and that no representations have been made to her about the nature and extent of the liability of CSX, the court did not abuse its discretion in ruling that parol evidence was not admissible.

A release is a contract subject to "ordinary contract principles." *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md. App. 538, 548 (1998); *see also Bernstein v. Kapneck*, 290 Md. 452, 459 (1981). Thus, it "'is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control

11

and limit its operation.'" *Pantazes v. Pantazes*, 77 Md. App. 712, 719-20 (1989) (quoting *Shriver v. Carline & Fulton Co.*, 155 Md. 51, 64 (1928)). "'[W]here a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed.'" *Id.* at 720 (quoting *Kasten Constr. v. Rod Enters.*, 268 Md. 318, 328 (1973)). Whether a contract, including a release, is ambiguous, is a question of law that we decide *de novo. Calomiris v. Woods*, 353 Md. 425, 434 (1999). A contract is ambiguous if it reasonably can be understood to have two different meanings. *Id.* at 436.

The Release is not ambiguous. It compromised Shutter's claim arising from a repetitive or cumulative trauma injury to her low back at the L4-L5 and L5-S1 levels. It defined her injury as "instrasubstance changes . . . and disc herniation and/or bulge located at L4-5 and L5-S1 . . . *including any . . . condition, illness or injury resulting therefrom or relating thereto*." (Emphasis added.) Contrary to Shutter's argument, the language of the Release is not limited to a release of a new claim for an injury to the same levels of her spine that were fused in 2003. Shutter released CSX from any liability for that injury *and for any future claim she might have arising from the "progression" of her injury*. She acknowledged that she understood that her injury might "naturally progress," that she might need "future medical treatment, including surgery," that she "specifically bargained for" the release of any claim arising from "the possib[le] . . . progression of such injuries," and that she was releasing CSX for liability for "any increased risk of contracting any physical disorder related" to her Repetitive Strain Injury. The language about progression of her injury and increased risks is clear and

12

cannot reasonably be read to mean that Shutter only was releasing CSX from liability for an injury to the L4-L5 and L5-S1 levels of her spine.

As discussed, Dr. Selya testified at his deposition that Shutter's new symptoms in 2011—numbness and radiating pain in her legs—were caused by a disc herniation at the L3-L4 level of her spine that narrowed her spinal column at that level and put pressure on the nerves. He opined that the underlying etiology was adjacent disc disease, that is, degeneration of a disc adjacent to fused vertebrae.[10] He explained that repetitive trauma at her job likely accelerated the degeneration of the disc at the L3-L4 level, but that the fusion surgery was the root cause of the progressive degeneration of that disc. Dr. Selya's testimony makes plain that the herniation of the adjacent disc was a "condition[] relat[ed] to [Shutter's] Repetitive Strain Injury" because it would not have occurred absent the 2003 fusion surgery. Thus, while the 2011 injury may have been "new," it was not "distinct" from Shutter's 2003 injury and the Release barred her claim for damages arising from that injury. And, even if the progression of Shutter's 2003 injury was accelerated by her subsequent work, it remained a progression.

Shutter maintains that if the Release as written bars her claim, it is invalid under Section 5 of the FELA, and therefore is ineffective. That section states, in pertinent part,

---

[10] Dr. Gill did not offer a contrary opinion. She largely deferred to Dr. Selya with respect to the cause of Shutter's injury, but opined that, in her view, the radiculopathy Shutter experienced in 2011 could not have been caused by disc herniation at the L4-L5 or L5-SI levels because those vertebrae had been removed and fused in 2003. Dr. Gill did not opine that the degeneration of Shutter's adjacent disc was unrelated to the 2003 injury and the fusion surgery.

13

that "[a]ny contract . . ., the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter shall to that extent be void . . . ." 45 U.S.C. §55.

Recently, in *Blackwell, supra*, we addressed the validity of releases under the FELA. There, Blackwell brought a FELA action against CSX, his employer, alleging that he had "developed 'repetitive stress disorders' to his 'knees and surrounding body structures'" as a direct and proximate result of walking on "'improper ballast [rocks] along the railroad tracks.'" 220 Md. at 117 (alteration in original). In 2009, he settled his FELA action, signing a release discharging CSX from any liability for the injuries he alleged he had sustained and for "'the development of any new or additional repetitive stress or cumulative trauma injury either presently existing or that may arise in the future to the lower extremities or other body parts.'" *Id*. Four years later, he filed another FELA action against CSX, alleging that he had "'developed repetitive trauma related disorders, including injuries to his feet and surrounding body structures (bilateral plantar fasciitis)'" caused by walking on ballast. *Id*. at 118. CSX moved for summary judgment, arguing that Blackwell's claim was barred by the release. Blackwell opposed the motion, arguing that the release was void under Section 5 of the FELA and, in any event, did not bar his claims because when he executed the release he did not know or have reason to know of any injury to his feet or any risk of developing an injury to his feet. The circuit court granted CSX's motion for summary judgment and Blackwell appealed.

This Court affirmed. We explained that the Supreme Court has held that the "sweeping language" of Section 5, *id*. at 121, is not intended to void agreements

14

"compromising a claimed liability." *Callen v. Pa. R.R. Co.*, 332 U.S. 625, 631 (1948). In *Callen*, a railroad employee injured his back in a workplace accident and alleged that the railroad's negligence had caused the accident. He accepted $250 in payment from the railroad and executed a general release of all claims arising from his injury. Then, after learning that his back injury was "more severe and permanent" than he or the railroad had realized, he sued the railroad. 220 Md. App. at 121. The railroad asserted that the claim was barred by the release. The Supreme Court held that the release was a valid settlement of a claimed liability and did not violate the FELA. A year later, the Supreme Court clarified, in *Boyd v. Grand Trunk W. R.R. Co.*, 338 U.S. 263, 266 (1949), that a release that amounts to a "full compromise enabling the parties to settle their dispute without litigation" is valid under the FELA, whereas "a device which obstructs the right of the [FELA] plaintiff to secure the maximum recovery if he should elect judicial trial of his cause" is void under Section 5 of the FELA.

In *Blackwell*, we explained that, based on *Callen* and *Boyd*, the Third Circuit Court of Appeals has adopted the "known risk" test by which to analyze releases under the FELA.[11] In *Wicker v. Consolidated Rail Corp.*, 142 F.3d 690 (3rd Cir. 1998), the question before the court was whether FELA actions brought by five railroad employees based on their exposure to toxic chemicals were barred by releases they had executed "in settlement of FELA claims that were unrelated to the risk of exposure to toxic

---

[11] We noted that there is no Supreme Court or Fourth Circuit authority addressing how to determine whether a release "acts as a full compromise of a claimed liability." 220 Md. App. at 123.

chemicals." *Blackwell*, 220 Md. App. at 124. The releases were broad. They purported to release the railroad employer from "*every* employment-related claim . . . both past and future." *Id*. (emphasis in original) (footnote omitted). The *Wicker* court held that

> a release does not violate § 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute "controversies," and may not be waived under § 5 of [the] FELA. *See Callen*, 332 U.S. at 631. . . . For this reason, a release that spells out the quantity, location and duration of potential risks to which the employee has been exposed – for example toxic exposure – allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries of specifically known risks does not violate § 5 of [the] FELA.

142 F.3d at 701. The *Wicker* court "specifically avoided limiting the scope of settlement releases to those injuries in existence at the time the release was executed." *Blackwell*, 220 Md. App. at 125 (citing *Wicker*, 142 F.3d at 700-01). That court reasoned that allowing railroad employers and employees to compromise potential future claims based upon known risks could benefit both parties by avoiding litigation and permitting an employee to receive immediate compensation.

The court in *Wicker* explained that, in determining the "risks 'known' to both parties at the time a release is executed, courts look to the terms of the release as 'strong . . . evidence of the parties' intent,' particularly if the release 'chronicles the scope and duration of the known risks' without 'merely detail[ing] a laundry list of diseases or hazards.'" *Id*. (quoting *Wicker*, 142 F.3d at 701) (alteration in *Blackwell*). Applying this test to the releases before it, the *Wicker* court held that the releases were not valid under

16

the FELA because they were not limited in scope but were intended to release the railroad from any liability for any future employment related injury.

In *Blackwell*, we "adopt[ed]" the "'known risk' test," finding it consistent with Section 5 of the FELA and with *Callen*. Applying the test to the release executed by Blackwell, we held that the release was valid and operated to bar Blackwell's claim for injuries to his feet. The release compromised claims for injuries caused by repetitive trauma to Blackwell's "knees and surrounding body structures" and was limited in scope to those injuries and future injuries arising from repetitive trauma "to the lower extremities." The unambiguous language of the release showed that Blackwell intended to release any future claim for injuries to his lower extremities caused by repetitive trauma.

We return to the case at bar. The Release "spells out the quantity, location and duration of potential risks to which [Shutter] has been exposed." *Wicker*, 142 F.3d at 701. The potential risks identified are those related to and *progressing from* the 2003 repetitive trauma injury to Shutter's lumbar spine, which necessitated the fusion of two levels of her vertebrae. The scope of the Release is more narrow than the scope of the release upheld in *Blackwell*, which covered *any* future repetitive trauma injury to the employee's "lower extremities, or other body parts," even if not related to the compromised claim. In contrast, Shutter released CSX from liability only for her existing injury, its progression, and related conditions or injuries and risks. Like in *Blackwell*, the Release specifies that Shutter bargained for – and received consideration for – the release of future potential

17

claims arising from the progression of her injury or the development of new conditions caused by it. The Release does not violate Section 5 of the FELA.

Finally, the plain language of the Release, which, as we discussed in *Blackwell*, is "strong evidence" of the risks known to the parties at the time the Release was executed, states that Shutter understands and acknowledges that her injury might "naturally progress," may "become permanently disabling in the future," and might necessitate future surgery. She acknowledged in the Release that no representations were made to her to induce her to enter into the Release and that, in so doing, she was relying only upon her judgment and knowledge of "the nature and extent of [her] injuries including . . . the possibility of progression of such injuries." The circuit court correctly ruled that, in this situation, parol evidence about Shutter's conversation with Kaiser was not admissible to vary the terms of the Release.

For the same reasons articulated by this Court in *Blackwell*, the Release is a valid compromise of a known risk under the FELA and, for the reasons already explained, bars the instant claim.

## II.

## Expert Testimony

As noted above, the circuit court precluded Shutter from calling Dr. Nussbaum at trial and granted summary judgment on the ground that, without an expert witness to testify about the standard of care, Shutter could not make out a *prima facie* case of negligence. On appeal, Shutter contends the court abused its discretion in granting the

18

motion *in limine* as to Dr. Nussbaum, and, even if it did not, it erred in ruling that she could not prove her case absent an expert witness on liability.

CSX counters that expert testimony was necessary for Shutter to prove a breach of the standard of care, which is an element of negligence; that the court did not abuse its discretion by precluding Dr. Nussbaum from testifying; and, even if it did, summary judgment was warranted because, as evidenced by his deposition, Dr. Nussbaum was not going to testify that CSX had breached the standard of care.

The FELA states, in relevant part:

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury ... resulting in whole or in part *from the negligence* of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (2012) (emphasis added). Thus, unlike Maryland's Workers Compensation Act, the FELA requires the employee to prove negligence on the employer's part. Shutter alleged that CSX had been negligent by assigning her work beyond her physical capacity and not providing her a safe work environment. In particular, Shutter maintained that CSX had been negligent in not replacing her co-worker after he was discharged so that she ended up doing the work of two people.

We agree with CSX that the question whether it breached prevailing standards of care by creating an unsafe work environment for Shutter by its assignments to her and its decision not to replace her co-worker is not one that can be answered by lay people serving as jurors in the absence of expert testimony. *See Hartford Accident and Indem.*

19

*Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 257 (1996), *aff'd*, 346 Md. 122 (1997) (quoting *Virgil v. "Kash 'N' Karry" Serv. Corp.,* 61 Md. App. 23, 31 (1984)) (holding that expert testimony is required "'when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman'"). There was evidence that Shutter's truck was equipped with a boom for lifting objects; that there were other people available to assist her in lifting, if necessary; and that there were long stretches of time in which she had no work to do at all. The standards that govern proper staffing and workplace safety for railroads simply are not something that ordinary people would know. Therefore, expert testimony was necessary to prove the standard of care and any breach. *Schultz v. Bank of America, N.A.*, 413 Md. 15, 27 (2010) ("expert testimony was necessary to establish the standard of care" when alleged negligence involved "procedures that the trier of fact could not be expected to appreciate without the aid of expert testimony"); *see also Bridger v. Union Ry, Co.,* 355 F.2d 382, 389 (6th Cir. 1966) (noting that the "business of operating a railroad entails technical and logistical problems with which the ordinary layman has had little or no experience").

Whether the court abused its discretion in precluding Shutter from calling Dr. Nussbaum as a witness at trial is not material in this appeal because it is clear from Dr. Nussbaum's deposition that his trial testimony would not show that CSX breached the standard of care. Dr. Nussbaum testified in deposition that he was not going to give an opinion that CSX failed to provide Shutter with a safe place to work or that it negligently assigned Shutter work beyond her physical capacity. Moreover, he testified that his

20

"essential opinion" that Shutter's job duties "involve demands that exceed limits recommended in . . . two ergonomic guidelines" "does not make a job unreasonably dangerous . . . in and of itself."

Because Shutter's sole liability expert would not have given a standard of care opinion sufficient to prove a *prima facie* case of negligence, had he been permitted to testify, the circuit court correctly granted summary judgment in favor of CSX on that ground as well.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**