Concurring Opinion by
Adkins, J.,
which Barbera, C.J., and McDonald, J., join.
Most respectfully, I concur with the Majority decision. I agree that Dr. Garmoe’s testimony was properly excluded, however, I would explicitly adopt the Daubert approach to the admissibility of scientific expert testimony rather than applying Fryer-Reed.
The lack of evidence presented during the Fryer-Reed hearing connecting Dr. Garmoe’s methodology to his ultimate conclusion stems from the confusion our jurisprudence has created regarding the Frye-Reed standard. The issues presented in this case provide an opportunity for us to revisit our approach to scientific testimony and evaluate how our Frye- *175 Reed analysis interacts with Maryland Rule 5-702.[1] With this goal in mind, I begin with a brief overview of the evolution of Frye-Reed, both in Maryland and the federal courts.
The Federal Evolution of Frye
As the Majority explains, this Court adopted the Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), general acceptance test for evaluating scientific expert testimony in Reed v. State, 283 Md. 374, 391 A.2d 364 (1978). We explained that “before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert’s particular scientific field.” Id. at 381, 391 A.2d 364. We continued, “[I]f a new scientific technique’s validity is in controversy in the relevant scientific community, or if it is generally regarded as an experimental technique, then expert testimony based on its validity cannot be admitted into evidence.” Id. We made clear that the Frye-Reed analysis should be conducted as a threshold question before the trial court evaluates expert testimony under the criteria now codified in Rule 5-702. Id. at 389, 391 A.2d 364.
Twenty-five years later, the U.S. Supreme Court addressed Frye's, general acceptance standard in light of the Federal Rules of Evidence (“the FRE”), which were enacted after Frye was decided. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *176 involved the admissibility of expert testimony that a prescription antinausea drug caused the plaintiffs’ birth defects. Id. at 582-83, 113 S.Ct. 2786. The Court acknowledged that Rule 702 of the FRE (“FRE 702”), which governs expert testimony in federal courts, does not “establish[ ] ‘general acceptance’ as an absolute prerequisite to admissibility.” Id. at 588, 113 S.Ct. 2786. At the time, FRE 702 provided:[2]
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Id. Holding that FRE 702 superseded Frye’s general acceptance test, the Daubert Court explained that the proper standard for the admissibility of scientific evidence comes from the language of the Rule. Id. at 588-89, 113 S.Ct. 2786. It reasoned that “the requirement that an expert’s testimony pertain to ‘scientific knowledge’ establishes a standard of evidentiary reliability.” Id. at 590, 113 S.Ct. 2786. Before admitting scientific expert testimony, the Court explained, trial courts must determine “whether the reasoning or methodology underlying the testimony is scientifically valid.” Id. at 592-93, 113 S.Ct. 2786.
Providing “general observations” about how the trial court should assess the validity and reliability of scientific expert *177 testimony, the Court set forth four factors that a judge may consider: (1) whether the theory or technique “can be (and has been) tested”; (2) “whether the theory or technique has been subjected to peer review and publication”; (3) “the known or potential rate of error”; and (4) “general acceptance.” Id. at 593-94, 113 S.Ct. 2786. The Court clarified that this reliability assessment “does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.” Id. at 594, 113 S.Ct. 2786 (citation omitted). The Court explained that the Daubert approach to FRE 702 is “a flexible one,” but emphasized that the focus “must be solely on principles and methodology, not on the conclusions that they generate.” Id. at 594-95, 113 S.Ct. 2786.
In General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)—which we drew from in Blackwell v. Wyeth, 408 Md. 575, 971 A.2d 235 (2009), as part of our Fryer-Reed analysis—the Supreme Court elaborated on Dau-bert. It held that a trial court properly excluded expert testimony opining that the plaintiffs exposure to polychlori-nated biphenyls caused his lung cancer. Id. at 146-47, 118 S.Ct. 512. The Court rejected the argument that Daubert only permits a trial court to evaluate the methodology of the studies and not the experts’ conclusions. Clarifying Daubert, the Court explained, “Trained experts commonly extrapolate from existing data. But nothing in [ ] Daubert ... requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Id. at 146, 118 S.Ct. 512. Rather, the Court reasoned that a “court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.” Id.
In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court again clarified the reach of Daubert. In considering whether an engineer’s testimony about the cause of a tire blowout was subject to Daubert’s, reliability analysis, the Court held that Daubert’s “gatekeeping” standard applied to all testimony governed by *178 FRE 702—“scientific,” “technical,” and “other specialized” testimony. Id. at 147-49, 119 S.Ct. 1167. The Court did not find “a convincing need” to distinguish between scientific and other types of specialized testimony. Id. at 148, 119 S.Ct. 1167. It explained that no matter the precise type of specialized testimony, the trial court’s effort to assure that it is “reliable and relevant” will help the jury evaluate its value. Id. at 149, 119 S.Ct. 1167. The Court also emphasized that “the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.” Id. at 152, 119 S.Ct. 1167. Accordingly, it held that a trial court is not required to consider any or all of the Daubert factors in making its reliability determination—they were “meant to be helpful, not determinative.” Id. at 151, 119 S.Ct. 1167.
Since Daubert was decided, the majority of states have departed from the Frye standard in favor of the Supreme Court’s more flexible approach.[3] See generally Alice B. Lustre, Post-Daubert Standards for Admissibility of Scientific and Other Expert Evidence in State Courts, 90 A.L.R.5th 453 *179 annots. (2001) (collecting cases). A small minority of states either adhere to the traditional Frye standard or implement a modified Frye test.[4]
Maryland’s Recent Frye-Reed Jurisprudence
Despite other jurisdictions’ adoption of Daubert, we have continued to use the Frye-Reed standard to evaluate expert *180 testimony based on a scientific method or technique. The Committee Note to Maryland Rule 5-702, which was adopted one year after the Supreme Court decided Daubert, explains that the Rule “is not intended to overrule” Frye-Reed. It further states, “The required scientific foundation for the admission of novel scientific techniques or principles is left to development through case law.” A review of our recent case law demonstrates that we have modified our application of Frye-Reed such that our analysis has gradually moved towards the federal Daubert approach. We have adjusted our application of Frye-Reed in two main ways.
First, we have liberally applied the Frye-Reed analysis to testimony based on any scientific principle—new or old. In Clemons v. State, 392 Md. 339, 896 A.2d 1059 (2006), after setting forth the Frye-Reed standard as one “which makes evidence emanating from a novel scientific process inadmissible absent a finding that the process is generally accepted by the relevant scientific community,” we applied it to comparative bullet lead analysis, which, as we explained, was first created over 40 years earlier. Id. at 343, 365, 896 A.2d 1059, 1061 (emphasis added). In State v. Baby, 404 Md. 220, 946 A.2d 463 (2008), we held that testimony regarding rape trauma syndrome was subject to Frye-Reed after noting that the syndrome was first recognized in 1974. Id. at 271, 267, 946 A.2d 463, 492-93. Thus, like Daubert, we have implicitly recognized that a trial judge’s gatekeeping function should not be limited to new scientific theories—old “junk science” should be kept out of our courts as well.
We have also suggested that all testimony based on scientific techniques is subject to Frye-Reed by encouraging trial courts to take judicial notice when a scientific method is well-established in the relevant community, rather than skipping Frye-Reed because the method is not novel. See, e.g., Montgomery Mutual Insurance Co. v. Chesson (Chesson I), 399 Md. 314, 327, 923 A.2d 939 (2007); Wilson v. State, 370 Md. 191, 201, 803 A.2d 1034 (2002) (“Where the validity and reliability of a scientific technique is so broadly and generally accepted within the scientific community, as is the case of *181 ballistic tests, blood tests, and the like, a trial court may take judicial notice of its reliability.” (citation omitted)). In Dixon v. Ford Motor Co., 433 Md. 137, 70 A.3d 328 (2013), for example, we stated that a Frye-Reed analysis is required “only when the proposed expert testimony involves a ‘novel scientific method.’ ”[5] Id. at 149-50, 70 A.3d 328. Subsequently, however, we took judicial notice of the scientific principle’s general acceptance:
We may take judicial notice from our own decisions that the scientific community accepts the proposition that exposure to asbestos may cause mesothelioma. That is not a novel scientific principle. More than 20 years ago, in Eagle-Picher v. Balbos, 326 Md. 179, 194 n.7, 604 A.2d 445 (1992), based on evidence in the ease, we flatly rejected the assertion that mesothelioma cannot be caused by exposure to chrysotile asbestos. Thus, [the expert’s] opinion that exposure to chry-sotile asbestos in Ford brakes may cause mesothelioma also is not a novel scientific principle.
Id. at 150 (footnote omitted).
Second, we have modified the reach of Frye-Reed—inching closer to the federal Daubert standard—by using it not only to evaluate scientific methods, but also to assess scientific conclusions. In Wilson v. State, we- applied the Frye-Reed analysis to expert testimony opining that there was a one-in-four-million chance that both the defendant’s children had died from Sudden Infant Death Syndrome (“SIDS”). 370 Md. at *182 200, 803 A.2d 1034. Although the expert witness had used the product rule—a well-established method for calculating probability among independent events—we held that his testimony did not pass muster under Frye-Reed because “there is not general agreement in the medical community that multiple SIDS deaths in a single family” are independent. Id. at 209, 803 A.2d 1034, 1040 n. 5. In conducting our analysis, we sought to determine whether there was “general agreement in the scientific community as to the relationship between SIDS deaths within a single family.” Id. In other words, we sought to determine whether the expert’s intermediary conclusion— which then led him to use the product rule—was generally accepted.
In Chesson I, we held that Frye-Reed applied to medical opinion testimony describing a causal link between mold exposure and certain health effects. 399 Md. at 328, 923 A.2d 939. We disagreed with the Court of Special Appeals, which had concluded that a “doctor’s opinion as to the etiology of his patient’s arthritis is simply not the type of thing contemplated by the phrase ‘new and novel scientific technique.’ ” Id. at 324, 923 A.2d 939 (citation omitted). Emphasizing the similarity between this case and Wilson, we explained that because “the expert witness offered a medical opinion that was based on an underlying scientific principle,” his testimony was subject to Frye-Reed. Id. at 330-31, 923 A.2d 939. Accordingly, we held that the trial court erred in admitting the expert testimony without conducting a Frye-Reed analysis and remanded for the trial court to hold a Frye-Reed hearing. Id. at 333, 923 A.2d 939. To support our conclusion, we cited to a number of state and federal court cases applying the Daubert factors to evaluate expert testimony regarding mold exposure. Id. at 330-31, 923 A.2d 939.
In Blackwell, we conducted a Frye-Reed analysis but drew extensively from case law stemming from Daubert in doing so. We explained that the strength of a scientific theory depends on “the reliability of the analytical framework utilized by [the] expert.” Id. at 605, 971 A.2d 235 (emphasis in original). Adopting language from Joiner, we described an “analytical *183 gap” between the expert’s data and his conclusions. Id. at 606-10, 971 A.2d 235. We reasoned that Frye-Reed requires the expert to have drawn a conclusion “appropriate to the underlying data and methods,” and thus broadened the reach of the Frye-Reed standard beyond methodology. Id. at 606, 971 A.2d 235 (citation omitted). Quoting Joiner, we emphasized that even when an expert’s data was collected through a generally accepted methodology, which' would., otherwise satisfy Frye-Reed, a trial court is not required to' “admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Id. (emphasis in original).
Our discussion of Frye-Reed in Blackwell—just like the Majority’s analysis of Dr. Garmoe’s - opinion here—demonstrates the overlap between Frye-Reed and Maryland Rule 5-702, which governs the admissibility -of all expert testimony. As we explained in Reed, our Frye-Reed test serves as only a threshold inquiry for certain types of scientific testimony. That testimony must also pass through Rule 5-702, which provides:
Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.
(Emphasis added.) The third prong of this analysis—sufficient factual basis—has been interpreted to include two subfactors: an adequate supply of data and a reliable methodology. Roy v. Dackman, 445 Md. 23, 42-43, 124 A.3d 169 (2015) (citation omitted); see also Exxon Mobil Corp. v. Ford, 433 Md. 426, 478, 71 A.3d 105 (2013). To satisfy Rule 5-702(3), “an expert opinion must provide a sound reasoning process for inducing its conclusion from the factual data and must have an adequate theory or rational explanation of how the factual data *184 led to the expert’s conclusion.” Ford, 433 Md. at 481, 71 A.3d 105 (citation and internal quotation marks omitted).
In Blackwell’s Frye-Reed discussion, we acknowledged that “reliability ... affect[s] whether a scientific theory is accepted in the field in which it is offered.” 408 Md. at 584, 971 A.2d 235. We turned to federal case law to define the contours of this term because of Daubert’s emphasis on reliable expert testimony. Id. at 604-07, 971 A.2d 235, 260. We concluded that the expert’s testimony was inadmissible under Frye-Reed, in part, because his research was not “based upon sound methodology.” Id. at 609, 971 A.2d 235, 260. Thus, our evaluation of whether a conclusion was generally accepted included inquiry as to whether the methodology used was reliable—one of the 5-702(3) subfactors. See Roy, 445 Md. at 42-43, 124 A.3d 169. Accordingly, to determine the admissibility of expert testimony under our direction in Blackwell, a trial court may have to analyze the reliability of an expert’s methodology twice—once under Frye-Reed and again under Rule 5-702(3). Adopting the Daubert approach and confining our evaluation of scientific expert testimony to the requirements of Rule 5-702 would eliminate this repetition.
Legal scholars have widely debated the advantages and drawbacks of both the Frye and Daubert standards. See, e.g., Edward K. Cheng & Albert H. Yoon, Does Frye or Daubert Matter? A Study of Scientific Admissibility Standards, 91 Va. L. Rev. 471 (2005); Edward J. Imwinkelried, The Epistemological Trend in the Evolution of the Law of Expert Testimony: A Scrutiny at Once Broader, Narrower, and Deeper, 47 Ga. L. Rev. 863 (2013); Henry G. Miller, The Daubert Debacle, 77 N.Y. St. B.J., Mar.-Apr. 2005, at 24. Neither standard is perfect. But I am not convinced that Maryland judges will be any less diligent in excluding unreliable expert testimony from the courtroom under Daubert. Indeed, some commentators have concluded that trial judges applying Daubert have excluded more expert testimony by “scrutinizfing] scientific evidence more closely.” Cheng & Yoon, Does Frye or Daubert Matter?, supra, at 472 (citing Lloyd Dixon & Brian Gill, Changes in the Standards for Admitting Expert Evidence in *185 Federal Civil Cases Since the Daubert Decision, xv (2001); Carol Krafka et al., Judge and Attorney Experiences, Practices, and Concerns Regarding Expert Testimony in Federal Civil Trials, 8 Psychol., Pub. Pol’y & L. 309, 330-31 (2002)). I am confident that Daubert's more flexible approach will aid trial courts in their gatekeeping function without tipping the scales in favor of either plaintiffs or defendants.
I am persuaded in part by the recent opinion of the D.C. Court of Appeals, which departed from its longstanding application of Frye in favor of the Daubert standard. Motorola Inc. v. Murray, 147 A.3d 751, 757 (D.C. 2016). In adopting the text of FRE 702, the court reasoned that the “ability to focus on the reliability of principles and methods, and their application, is a decided advantage that will lead to better decision-making by juries and trial judges alike.”[6] Id. The D.C. Court of Appeals acknowledged that Daubert’s flexible standard will inevitably produce “[s]ome inconsistency,” but explained that it will more accurately distinguish “good science” from “bad science” than Frye’s general acceptance test. Id. at 756. As another court reasoned when it adopted the Daubert standard, focusing only on general acceptance is “both unduly restrictive and unduly permissive.” State v. Coon, 974 P.2d 386, 394 (Alaska 1999). “[I]t excludes scientifically reliable evidence which is not yet generally accepted, and admits scientifically unreliable evidence which although generally accepted, cannot meet rigorous scientific scrutiny.” Id. at 393-94. I agree. Additionally, I believe that conforming our approach to that taken by the majority of jurisdictions will allow Maryland courts to draw from and contribute to the broad base of case law grappling with scientific testimony. See Motorola, 147 A.3d at 757 (noting that adopting Daubert will allow D.C. courts to “learn from the decisions of other courts which apply [FRE] 702 or its state counterparts”).
*186 The evolution of our Frye-Reed doetrine to both maintain the general acceptance test and include a check for an “analytical gap” has muddied our approach to expert testimony. See Nancy E. Bonifant, Note, Blackwell v. Wyeth; It’s Our Courtroom and We’ll Frye (Only) If We Want To—The Maryland Court of Appeals’s Unstated Adoption 0/Daubert, 69 Md. L. Rev. 719 (2010). The Majority opinion continues this trend by first laying out our Frye-Reed standard but then applying the “analytical gap” analysis from the Supreme Court’s Daubert jurisprudence. Maj. Op. at 160-61, 162-72, 166 A.3d at 196, 197-203. In my view, we should follow the majority of states and acknowledge our implicit adoption of Daubert. I would do away with Frye-Reed and hold that the Daubert factors used to interpret FRE 702 are persuasive in interpreting Rule 5-702.[7] Rule 5-702(3) serves as a sufficient bulwark for preventing shoddy scientific testimony from flooding our courtrooms. See Rochkind v. Stevenson, No. 76, 2017 WL 2952984, at *4-8 (Md. July 11, 2017) (holding that expert testimony was inadmissible under Rule 5-702(3) due to an “analytical gap”).
In reaching this conclusion, I am mindful of the principle of stare decisis, which “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Conover v. Conover, 450 Md. 51, 64, 146 A.3d 433 (2016) (quoting Livesay v. Balt. Cty., 384 Md. 1, 14, 862 A.2d 33 (2004)). We have acknowledged, however, that stare decisis “is not an inexorable command.” Id. at 65, 146 A.3d 433 (quoting Bozman v. Bozman, 376 Md. 461, 493-94, 830 A.2d 450 (2003)). Rather, we have recognized two circumstances in which it is appropriate to depart from stare decisis: “(1) when the prior decision is clearly wrong and contrary to established principles!);] or (2) when the precedent has been superseded by significant changes in the law or facts.” Id. (internal quotation marks *187 omitted) (quoting DRD Pool Serv., Inc. v. Freed, 416 Md. 46, 64, 5 A.3d 45 (2010)). Here, I would find that the second circumstance applies. The federal courts’ adoption of Daubert, coupled with our own jurisprudential drift towards the Dau-bert standard, supports our departure from Frye-Reed.
Chief Judge Barbera and Judge McDonald authorize me to state that they agree with the views expressed in this concurring opinion.

. Although neither party asks us to adopt Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we should exercise our discretion under Maryland Rule 8-131(a) to do so. Acknowledging.our implicit adoption of Daubert would not only be "desirable to guide the trial court” in this case but would also provide clarity to Maryland courts. See Md. Rule 8-131(a). Furthermore, unlike Rochkind v. Stevenson, No. 76, 2017 WL 2952984 (Md. July 11, 2017), our most recent case addressing the admissibility of scientific expert testimony, we can only dispose of the case at hand by applying Frye-Reed. In Rochkind, we declined to address the parties' arguments regarding Frye-Reed and instead held that the expert testimony was inadmissible under Rule 5-702 because the petitioner had appealed the trial court’s determination as to both standards. Id. at *8. Here, Savage only challenges the exclusion of Dr. Garmoe’s testimony under Frye-Reed.

. In 2000, the Federal Rules of Evidence ("the FRE”) were amended to reflect the U.S. Supreme Court’s jurisprudence in the wake of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Fed. R. Evid. 702 advisory committee’s note. They were restyled in 2011 without substantive change. FRE 702 now provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

. Thirty-eight states have either explicitly adopted Daubert or held that its factors are persuasive in evaluating expert witness testimony. Ga. Code Ann. § 24-7-702(f) (West 2013); Colbert Cty. Nw. Alabama Health Care Auth. v. RegionalCare Hosp. Partners, Inc., 195 So.3d 948, 960 (Ala. Civ. App. 2015); State v. Coon, 974 P.2d 386, 394-95 (Alaska 1999); State v. Bernstein, 237 Ariz. 226, 349 P.3d 200, 203 (2015); Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Foote, 341 Ark. 105, 14 S.W.3d 512, 519 (2000); People v. Shreck, 22 P.3d 68, 77 (Colo. 2001); State v. Porter, 241 Conn. 57, 698 A.2d 739, 746 (1997); M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d 513, 521-22 (Del. 1999); State v. Vliet, 19 P.3d 42, 53 (Haw. 2001); Weeks v. Eastern Idaho Health Servs., 143 Idaho 834, 153 P.3d 1180, 1184 (2007); Malinski v. State, 794 N.E.2d 1071, 1084 (Ind. 2003); Leaf v. Goodyear Tire & Rubber Co., 590 N.W.2d 525, 533 (Iowa 1999); State v. Sasser, 305 Kan. 1231, 391 P.3d 698, 708 (2017); Toyota Motor Corp. v. Gregory, 136 S.W.3d 35, 39 (Ky. 2004), as amended (June 14, 2004); Cheairs v. State Dep't of Trans. & Dev., 861 So.2d 536, 540-43 (La. 2003); Commonwealth v. Lanigan, 419 Mass. 15, 641 N.E.2d 1342, 1349 (1994); Gilbert v. DaimlerChrysler Corp., 470 Mich. 749, 685 N.W.2d 391, 408 (2004); Watts v. Radiator Specialty Co., 990 So.2d 143, 147 (Miss, 2008); State Bd. of Registration for Healing Arts v. McDonagh, 123 S.W.3d 146, 155 (Mo. 2003) (en banc); State v. Price, 339 Mont. 399, 171 P.3d 293, 298 (2007) (applying *179 Daubert only to “novel scientific evidence”); Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862, 876 (2001); Higgs v. State, 125 Nev. 1043, 126 Nev, 1, 222 P.3d 648, 659 (2010); Baxter v. Temple, 157 N.H. 280, 949 A.2d 167, 173 (2008); State v. Alberico, 116 N.M. 156, 861 P.2d 192, 203 (1993); State v. McGrady, 368 N.C. 880, 787 S.E.2d 1, 5 (2016); Miller v. Bike Athletic Co., 80 Ohio St.3d 607, 687 N.E.2d 735, 740-42 (1998); Christian v. Gray, 65 P.3d 591, 600 (Okla. 2003), as corrected (Feb. 24, 2003); State v. O’Key, 321 Or. 285, 899 P.2d 663, 680 (1995); DiPetrillo v. Dow Chem. Co., 729 A.2d 677, 686 (R.I. 1999); Kostel v. Schwartz, 756 N.W.2d 363, 387 (S.D. 2008); McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997); E. I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995); Gunn Hill Dairy Properties, LLC v. Los Angeles Dep’t of Water & Power, 269 P.3d 980, 990 (Utah App. 2012); State v. Brooks, 162 Vt. 26, 643 A.2d 226, 229 (1993); Hasson v. Commonwealth, No. 0403-05-4, 2006 WL 1387974, at *10 (Va. Ct. App. May 23, 2006); Wilt v. Buracker, 191 W.Va, 39, 443 S.E.2d 196, 203 (1993); Bayer ex rel. Petrucelli v. Dobbins, 371 Wis.2d 428, 885 N.W.2d 173, 180 (2016); Bunting v. Jamieson, 984 P.2d 467, 471 (Wyo. 1999); see also H.B. 153, 99th Gen. Assemb., 1st Reg. Sess. (Mo. 2017) (adopting expert witness rule identical to FRE 702). Maine and South Carolina apply factors similar to Daubert's in interpreting their expert witness rules. Searles v. Fleetwood Homes of Penn., Inc., 878 A.2d 509, 516 (Me. 2005); State v. Council, 335 S.C. 1, 515 S.E.2d 508, 518 (1999).

. Eight states apply a traditional or modified Frye test. Ill. R. Evid. 702; People v. Leahy, 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321, 331 (1994) (rejecting Daubert standard in favor of "more 'conservative' Frye approach”); Marsh v. Valyou, 977 So.2d 543, 546-51 (Fla. 2007) (adhering to Frye); Doe v. Archdiocese of St. Paul, Minneapolis, 817 N.W.2d 150, 168 (Minn. 2012) (conducting both Frye and reliability analyses); State v. Chun, 194 N.J. 54, 943 A.2d 114, 136 (2008) (applying Frye in criminal cases); Cornell v. 360 W. 51st St. Realty, LLC, 22 N.Y.3d 762, 986 N.Y.S.2d 389, 9 N.E.3d 884, 898-901 (2014) (applying Frye to both scientific methods and conclusions); Commonwealth v. Puksar, 597 Pa. 240, 951 A.2d 267, 274-77 (2008) (analyzing expert testimony under Frye); Anderson v. Akzo Nobel Coatings, Inc., 172 Wash.2d 593, 260 P.3d 857, 861-62 (2011) (adhering to Frye). North Dakota does not use Frye or Daubert to interpret its rule regarding expert witness testimony. State v. Hernandez, 707 N.W.2d 449, 462 (N.D. 2005) (Crothers, J., concurring).

. Despite our repeated assertions that Frye-Reed applies only to new scientific methods, we have never defined what constitutes a new or novel scientific method. See Montgomery Mut. Ins. Co. v. Chesson, 399 Md. 314, 327, 923 A.2d 939 (2007) (expláining that Frye-Reed requires a party to "establish first that any novel scientific method is reliable and accepted generally in the scientific community before the court will admit expert testimony based upon [it]” (citation omitted)); Clemons v. State, 392 Md. 339, 363, 896 A.2d 1059 (2006) (explaining that Reed adopted a standard for the admission of “novel scientific techniques”); Wilson v. State, 370 Md. 191, 201, 803 A.2d 1034 (2002) ("[P]rior to the admission of expert testimony based on the application of new scientific techniques, it must be first established that the particular scientific method is itself reliable.” (citation omitted)). We have never held that a scientific method is not subject to Frye-Reed because it is not new.

. In the absence of legislative action, the D.C. Court of Appeals "is the final authority for establishing the evidentiary rules for the Superior Court of the District of Columbia." Motorola Inc. v. Murray, 147 A.3d 751, 752 n.2 (D.C. 2016) (quoting Laumer v. United States, 409 A.2d 190, 195 n.7 (D.C. 1979) (en banc)).

. As the Court of Special Appeals has already acknowledged, Rule 5-702 and our interpreting decisions are consistent with the language of FRE 702. Wood v. Toyota Motor Corp., 134 Md.App. 512, 523 n.13, 760 A.2d 315 (2000).